Erin Rose Ronstadt, SBN 028362
Kevin Koelbel, SBN 016599
OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oberpekas.com
kevin@oberpekas.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Winterberg, a single man,<br><br>                Plaintiff,<br><br>v.<br><br>Metropolitan Life Insurance Company, an ERISA plan fiduciary,<br><br>                Defendant. | No.<br><br>**COMPLAINT** |

For his claims against Defendant Metropolitan Life Insurance Company ("MetLife" or "Defendant"), Plaintiff Christopher Winterberg ("Mr. Winterberg" or "Plaintiff") alleges as follows:

## JURISDICTION, VENUE AND PARTIES

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

2. Mr. Winterberg's employer provided long-term disability ("LTD") benefits to its employees under an ERISA benefit plan (the "Plan").

3. Mr. Winterberg was and continues to be a participant and beneficiary of the Plan.

4. Mr. Winterberg is a single person and continues to be a resident of Maricopa County, Arizona since becoming a participant and beneficiary of the Plan.

5. At all times that Mr. Winterberg has been eligible for LTD benefits under the Plan, MetLife administered claims under the Plan, acted on behalf of the Plan, and acted as

1  an agent of the Plan administrator.

2      6.    MetLife fully insured LTD benefits under the Plan with a Policy, Group
3  Policy Number 90280-G.

4      7.    MetLife is either a "named fiduciary" of the Plan, pursuant to 29 U.S.C. §
5  1133(2); a "deemed fiduciary" pursuant to 29 U.S.C. § 1002 (21)(A); or a "designated
6  fiduciary," pursuant to 29 U.S.C. § 1105(c)(1)(B).

7      8.    MetLife administered the Plan and made final decisions regarding the
8  payment of disability benefits under the Plan

9      9.    MetLife had actual or apparent authority to act as a fiduciary on behalf of the
10  Plan.

11      10.    This Court has jurisdiction over the subject matter of this action under
12  ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

13      11.    Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28
14  U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

16      12.    Mr. Winterberg was and continues to be eligible for LTD coverage as of
17  2004.

18      13.    Mr. Winterberg worked as an Operations Store Manager, which is considered
19  a light-duty job, until his last day of work on December 11, 2007.

20      14.    Mr. Winterberg stopped working on December 11, 2007 due to disabling
21  conditions.

22      15.    He qualified for and received short-term disability ("STD") benefits through
23  a salary continuation program. Thereafter, after meeting a concurrent elimination period,
24  MetLife awarded LTD benefits effective March 11, 2008.

25      16.    After paying Mr. Winterberg's claim for nearly a decade, MetLife terminated
26  benefits without demonstrating significant changed circumstances in Mr. Winterberg's
27  medical conditions and by ignoring his entire clinical picture.

28      17.    Since March 11, 2010, MetLife applied the "any gainful work or service"

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

definition of Disability, *i.e.*, Mr. Winterberg must "be unable to perform each of the material duties of any gainful work or service for which [he is] reasonably qualified taking into consideration [his] training, education, experience and past earnings;" **or** "while unable to perform all of the material duties of [his] regular job on a full-time basis, [be able to perform] at least one of the material duties of [his] regular job or any other gainful work or service on a part-time or full-time basis; **and** [earn] currently at least 20% less per month than [his] Indexed Basic Monthly Earnings due to that same Injury or Sickness" (the "gainful wage requirement").

18.  "Indexed Basic Monthly Earnings" are the "Basic Monthly Earnings" in effect on the date Disability began, increased by 7% annually for cost of living adjustments ("COLA").

19.  Put more plainly, in order for MetLife to find Mr. Winterberg ineligible for benefits, Mr. Winterberg must either: 1) be able to perform his regular light duty occupation; or else 2) return to work in any occupation where he can earn 80% of his Indexed Basic Monthly Earnings.

20.  At various times throughout the claim, MetLife found Mr. Winterberg Disabled from any gainful occupation based on an inability to meet the gainful wage requirement.

21.  In 2010, MetLife determined that Mr. Winterberg could not perform his regular occupation, because he could not perform light duty work.

22.  Thus, on or about February 10, 2010, MetLife requested that MetLife's vendor, "CorVel," conduct a labor market survey ("LMS") on a "rush basis" to determine whether any "gainful work or service" existed.

23.  Mr. Winterberg is informed and believes that CorVel provided the LMS to MetLife on or about March 1, 2010.

24.  MetLife determined that no "gainful work or service" existed that would provide Mr. Winterberg 80% of his Indexed Basic Monthly Earnings.

25.  To date and despite multiple requests, MetLife has not produced the LMS to

-3-

Mr. Winterberg.

26. Contemporaneous claim file notes reveal some information about the LMS. The LMS involved contacting at least 12 employers, none of whom stated they employ people in the identified positions at the required gainful wage.

27. MetLife identified four occupations within Mr. Winterberg's skills and physical capacity, but MetLife concluded "[a]lthough the occupations are within the skills and physical capacity of Mr. Winterberg, he is unable to earn a gainful wage based on [Department of Labor] wage information and a labor market survey. **Therefore Mr. Winterberg is unable to [return to work] at gainful wage in any occupation.**" (emphasis added).

28. Accordingly, in March 2010, MetLife approved Mr. Winterberg's LTD benefits under the "any gainful work or service" definition of Disability.

29. At that time, MetLife knew Mr. Winterberg's inability to earn a gainful wage meant that he would qualify for LTD benefits potentially over the life of the claim, or until June 2036.

30. Unless Mr. Winterberg returned to work, or MetLife found another way to deny the claim, MetLife understood that it would be facing ongoing liability.

31. On March 1, 2010, MetLife simultaneously approved the claim for ongoing benefits and initiated return to work efforts.

32. Notably, the Plan does not feature a work incentive program, a rehabilitation incentive after the first 24 months on claim, or any type of mandatory vocational rehabilitation requirement.

33. Mr. Winterberg completed all required forms about his daily activities and abilities as requested.

34. MetLife conducted surveillance on June 8, 9, and 10, 2010.

35. MetLife determined that the activities observed in the June 2010 surveillance did not support the ability to work 8 hours a day in light-duty work capacity.

36. All of the surveillance MetLife has conducted on this claim consistently demonstrated Mr. Winterberg has truthfully and consistently reported his abilities and that he is disabled as defined by the Plan.

37. On October 7, 2010, MetLife concluded benefits should be [paid through] "6/9/2036 since [Mr. Winterberg] will continue to have these [medical] issues and there is not sedentary work at gainful wage for [him]."

38. MetLife acknowledged in an October 15, 2010 internal note on the claim: "Based on [the gainful wage] information and reviewing the file wholistically[sic] nothing will change unless [Mr. Winterberg] determines he wants retraining . . . Therefore; [plan of action] is to [send to the Special Handling Unit ("SHU")]. If [Mr. Winterberg] at some point determines he wants retraining or will have surgery, [then] file to be referred back to the claims team."

39. MetLife later explained, "[t]he SHU is designed to maintain long term disability claims when there is no question as to the permanent nature of the disability, or a return to gainful employment is highly unlikely."

40. For several years, MetLife's SHU administered Mr. Winterberg's claim, including monitoring for medical developments, activities of daily living, and the status of Mr. Winterberg's pending Social Security claim.

41. SHU continued to find that Mr. Winterberg was eligible for LTD benefits due to the gainful wage requirement and his worsening medical conditions. For example, on March 1, 2013 the SHU claim manager noted, "[attending physician] indicates [Mr. Winterberg] may do sedentary jobs. However [vocational department] was unable to find sedentaty [sic] jobs and wages that were with[in] the defention [sic] of wages."

42. Mr. Winterberg is informed and believes that MetLife hired SALT Associates, LLC, a consulting firm based in Portland, Maine, to provide risk management services with respect to its SHU claims.

43. Mr. Winterberg is informed and believes that MetLife sets "tasks" and "alerts" on claims, which prompt MetLife to review SHU claims.

44. Mr. Winterberg is informed and believes that MetLife only authorizes benefit payments for limited time periods, even on claims where MetLife has previously accepted financial liability that exceeds the limited authority it provides for issuing payments.

45. Mr. Winterberg is informed and believes that when a claim reaches the end of its allotted payment approval authority, MetLife places an alert on the claim for "USER EXCEEDED AUTHORITY," which prompts MetLife to again "review [the] claim – decision and Benefit [payment]."

46. Mr. Winterberg is informed and believes that MetLife authorizes benefit payments in a way that allows it to report more favorable financial outcomes for the company, and which serves as an opportunity for MetLife to look for reasons to reduce or terminate otherwise valid claims.

47. On November 12, 2013, MetLife's system generated a "USER EXCEEDED AUTHORITY" alert on Mr. Winterberg's claim.

48. Mr. Winterberg is informed and believes that, as a result of the "USER EXCEEDED AUTHORITY" alert, April Cloutier, a claims manager with SALT Associates, LLC, reviewed Mr. Winterberg's claim with the goal of generating a "risk management" outcome for MetLife.

49. Ms. Cloutier approached Mr. Winterberg's claim from a skeptical, adversarial perspective. For example, even though MetLife had known for years that Mr. Winterberg could perform sedentary work from a physical standpoint (but could not find a job that satisfies the wage requirement of the Plan), Ms. Cloutier used Mr. Winterberg's sedentary capacity to justify Internet research on Mr. Winterberg.

50. Ms. Cloutier learned that Mr. Winterberg had authored a book for sale on Amazon and erroneously assumed Mr. Winterberg might be deriving income significant enough to create an offset against LTD benefits for MetLife.

51. Ms. Cloutier interviewed Mr. Winterberg, but instead of asking about income from the book, she hid the ball and tried to trap him to make him look dishonest. Had she been forthright, she would have learned that Mr. Winterberg actually lost money on the

book. And, in fact, his writing was not a secret; he had repeatedly disclosed writing as a hobby on his activities of daily living forms.

52. Ms. Cloutier lamented the "plan doesn't have mandatory [rehabilitation] and no gainful occs were available."

53. After Ms. Cloutier's review, and after offset issues were further resolved, MetLife transferred Mr. Winterberg's claim back to the claims department and out of the SHU.

54. MetLife went on what is best described as a "smear campaign" against Mr. Winterberg, which led to its November 8, 2016 adverse benefit determination (the "Denial").

55. MetLife took a considerable amount of time collecting medical records and forms from Mr. Winterberg and his treating providers.

56. In September 2015, MetLife employed Ethos Risk Services ("Ethos") to conduct an investigation.

57. Ethos surveilled Mr. Winterberg on December 31, 2015, January 1, 2016, and January 2, 2016, but only recorded 45 seconds of video footage on December 31, 2015.

58. The majority of the surveillance report is based on the biased perceptions of the Ethos agent.

59. Despite Ethos efforts, the surveillance did not reveal any evidence warranting a termination of benefits. MetLife continued to pay benefits.

60. Nine months later, determined to find a basis to terminate beneifts, MetLife ordered more investigation and surveillance.

61. Ethos conducted an additional Internet Data Investigation Report on September 22, 2016 and surveillance on September 13, 2016, September 14, 2016, and September 19, 2016 under MetLif'es explicit instruction to "attempt to get images of [Mr. Winterberg's] workout activities," which Mr. Winterberg reported on his ADL forms.

62. At MetLife's direction, Ethos invaded Mr. Winterberg's privacy, trespassed on private property, and secured some of the requested images.

63. Ethos obtained approximately 42 minutes of film from the video surveillance. And, the surveillance bolsters Mr. Winterberg's credibility because it is entirely consistent with past surveillance, as well as his reported functionality and ADLs.

64. MetLife's surveillance revealed nothing new. MetLife was well aware of Mr. Winterberg's activities of daily living from the beginning of the claim, yet it used these against him in an effort to terminate his benefits.

65. MetLife cannot penalize Mr. Winterberg for trying to maintain some semblance of a normal life. In fact, "several courts . . . have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The surveillance demonstrates that Mr. Winterberg has consistently and accurately reported his capabilities to MetLife during the claim.

66. To shore up the Denial, MetLife forwarded Mr. Winterberg's file to its in-house medical director, Dr. Tracy C. Barber, on October 5, 2016.

67. Because Dr. Barber is MetLife's medical director, his review of the file is far from "independent" and should be disregarded.

68. Dr. Barber misrepresented the evidence and faulted Mr. Winterberg for issues he had with health insurance.

69. Ultimately, MetLife largely based the Denial on Dr. Barber's medical file review.

70. In denying benefits, MetLife did not identify any jobs that meet the gainful wage requirement.

71. MetLife's rationale for finding that Mr. Winterberg's medical conditions "[do] not support a disability or functional impairment that would preclude [him] from performing any occupation which includes [his] former job as an Operations Store Manager" is unfounded.

72. Given that the medical evidence has not changed, termination of benefits is both illogical and in direct conflict with MetLife's prior findings.

73. MetLife determined for the better part of a decade that Mr. Winterberg could not perform light duty work.

74. MetLife has known this for years, which is why they continued to approve the claim, and they intentionally misrepresented the Plan language in its efforts to support the Denial.

75. On August 14, 2017, with the assistance of counsel, Mr. Winterberg timely appealed MetLife's Denial (the "Appeal") and supplied MetLife with updated medical evidence, declarations, and an updated LMS to support his continued disability.

76. With his appeal, Mr. Winterberg also submitted a report from Mark Kelman, MS. CRC, CVE, who conducted a vocational analysis on June 9, 2017, which included an in-person interview of Mr. Winterberg, a review of MetLife's claim file, a wage analysis using Phoenix 2015 Occupational Employment and Wage Hourly Estimate Survey, and a labor market survey.

77. Mr. Kelman concluded that Mr. Winterberg can neither perform the material duties of his regular job nor perform any other gainful work or service that meets the wage requirement of the Plan.

78. Under ERISA, 29 C.F.R. § 2560.503-1(i)(3)(i) and (i)(4), absent "special circumstance," MetLife had forty-five days from the date Mr. Winterberg filed his Appeal to make a decision on the appeal.

79. MetLife did not notify Mr. Winterberg of any "special circumstance," therefore, MetLife was required to make a decision on Mr. Winterberg's Appeal no later than Friday, September 29, 2017. *See* 29 C.F.R. § 2560.503-1(i)(4).

80. Even though the deadline to do so has passed, MetLife has not yet rendered a decision on the Appeal.

81. Mr. Winterberg is therefore deemed to have exhausted his administrative remedies and may file suit. *Id.*

82. Mr. Winterberg's claim for benefits under ERISA, 29 U.S.C. § 1132(a)(1) is therefore ripe.

**COUNT I**
**(Recovery of Plan Benefits)**

83. All previous and subsequent paragraphs are incorporated by reference.

84. The Plan represents LTD coverage and a promise to provide LTD benefits until Mr. Winterberg is no longer disabled under the terms of the Plan.

85. Mr. Winterberg became disabled in 2007 and eligible for LTD benefits in 2008.

86. He continues to be disabled under the terms of the Plan.

87. Mr. Winterberg reasonably expected that his conditions met the requirements of Disability as defined by the Plan for LTD benefits, and that he would receive benefits under the Plan until age 65 or until he was no longer disabled.

88. Despite the coverage of Mr. Winterberg's disability, MetLife has improperly terminated LTD benefits to Mr. Winterberg in breach of the Plan and ERISA.

89. MetLife acted under a structural conflict of interest in both administering and paying out on claims under the Plan.

90. Mr. Winterberg is entitled to *de novo* review of his claims, because given MetLife's structural conflict of interest and its "wholesale and flagrant violations of the procedural requirements of ERISA," *de novo* review is warranted. MetLife should not be entitled to any deference in its decision-making in light of the facts and circumstances of this claim.

91. MetLife's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and was clearly erroneous.

92. Mr. Winterberg was, and remains, disabled under the Plan.

93. Because MetLife failed to make a decision on Mr. Winterberg's LTD appeal within the deadlines prescribed by ERISA, Mr. Winterberg is entitled to *de novo* review of his LTD claim. *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1103 (9th Cir. 2003); *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006); *accord Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d

42, 57–58 (2d Cir. 2016); *but see Wilson v. Aetna Life Ins. Co.*, No. 815CV752MADCFH, 2016 WL 5717370, at *9 (N.D.N.Y. Sept. 30, 2016) ("Having opted to forego taking advantage of this provision by bringing her claim prior to receiving the adverse decision, Plaintiff cannot now argue that Aetna is stripped of its deferential review simply because she does not agree with the decision it rendered.").

94. Under the *de novo* standard of review, and even under the abuse of discretion standard of review, the decision terminating Mr. Winterberg's LTD benefits and the failure to timely reinstate his benefits is incorrect, contrary to the Plan terms, contrary to the overwhelming medical evidence, is arbitrary and capricious, is the product of MetLife's numerous procedural irregularities, is the product of MetLife's and its in-house and/or consulting physicians or other personnel's financial conflicts of interest, and should be reversed.

95. MetLife and its consulting physicians or other personnel's financial conflicts of interest infected the claims process and precluded the full and fair review of Mr. Winterberg's claim required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2). *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901 (9th Cir. 2016); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1010 (9th Cir. 2004).

96. Under ERISA, if the *de novo* standard of review does not apply, Mr. Winterberg is entitled to discovery to show the extent to which the financial conflicts of interest infected the claim process. *Id.* And, Mr. Winterberg is entitled to a bench trial regarding the effects of the inherent financial conflicts of interest on the decision to terminate his benefits and the failure to timely reinstate his benefits and/or on the credibility of MetLife's medical and other reviews. *Nolan v. Heald College*, 551 F.3d 1148 (9th Cir. 2009); *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007).

97. Mr. Winterberg has been injured and suffered damages in the form of lost LTD benefits as a result of MetLife's wrongful decision to deny his disability benefits.

98. Driven by its own financial interests and bias against Mr. Winterberg,

including the actions of SALT, MetLife became determined to deny Mr. Winterberg's claim after paying the claim for nearly a decade.

99. MetLife "hid the ball" from Mr. Winterberg by failing to advise him of what was needed to prove his LTD claim.

100. MetLife wrongfully terminated Mr. Winterberg's disability benefits without providing a coherent explanation for its denial, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

101. Despite multiple requests during the appeal process, MetLife continually failed to disclose all of Mr. Winterberg's relevant documentation, including information that was relied upon in support of the Denial.

102. MetLife's disclosures have been both untimely and deficient under ERISA, requiring significant attorney time to doggedly pursue disclosures and causing undue delay and financial harm to Mr. Winterberg.

103. Mr. Winterberg is informed and believes that MetLife has intentionally removed documents from the claim file that would otherwise explain MetLife's interpretation of the Plan and further reveal its reasons for continuing Mr. Winterberg's benefits until recently.

104. Besides the LMS report and other documents containing valuable analysis of the Plan as it pertains to this claim, Mr. Winterberg is informed and believes that various telephone conversations were either never properly documented or removed from the internal notes.

105. MetLife's conduct has prejudiced Mr. Winterberg in his ability to expediently appeal and perfect his claim, contravening the very purpose of ERISA.

106. MetLife did not properly consider all of the available evidence when terminating Mr. Winterberg's benefits. For example, it did not consider major surgeries and conditions. In doing so, MetLife failed to conduct a full and fair review.

107. MetLife blatantly misstated medical evidence and misrepresented diagnostic testing for its own financial benefit.

108. MetLife excessively relied on the flawed medical reviews and surveillance that actually supported continuation of benefits and ignored substantial evidence to support Mr. Winterberg's disability.

109. MetLife emphasized reports that favored a denial of benefits while deemphasizing other reports that suggested a contrary conclusion.

110. Despite ample opportunity to conduct an in-person independent medical evaluation ("IME") before terminating benefits, which would have been consistent with a full and fair review of Mr. Winterberg's claim, MetLife failed to conduct an IME and instead relied on unreliable evidence to terminate Mr. Winterberg's LTD benefits.

111. Only after Mr. Winterberg submitted his appeal, did MetLife ask for an IME, at which time it was improper and unreasonable. Gathering new evidence after a claimant has appealed violates ERISA.

112. MetLife failed to reasonably consider Mr. Winterberg's reported symptoms and limitations and gainful wage in determining whether he was disabled under the Plan.

113. MetLife selectively reviewed Mr. Winterberg's medical records, relying only on those portions of his medical records that supported a denial of benefits.

114. That Mr. Winterberg's conditions have not changed or improved since MetLife initially approved benefits under the "any gainful work or services" definition is confirmed by the medical evidence and MetLife's internal notes.

115. The collective medical evidence demonstrates Mr. Winterberg's degenerative conditions changed for the worse.

116. Having previously found Mr. Winterberg entitled to benefits, the burden is on MetLife to justify a denial of benefits.

117. Federal courts look skeptically at an administrator's decision to terminate benefits where the evidence fails to show significant improvement in the claimant's condition following the administrator's initial approval.

118. Because Mr. Winterberg was previously found disabled under the "any gainful work or service" definition of Disability, to terminate benefits MetLife must demonstrate

-13-

that his medical condition changed substantially.

119. MetLife has made no attempt to show medical improvement that would enable Mr. Winterberg to return to work. This is because Mr. Winterberg has not shown any medical improvement.

120. MetLife improperly demanded objective medical evidence of Mr. Winterberg's fatigue and thereby engrafted terms onto the Plan in violation of ERISA.

121. On information and belief, the file reviewers, IPCs, claims managers, consultants such as SALT, and vendors used to administer Mr. Winterberg's claim were financially incentivized to deny claims, including Mr. Winterberg's claim.

122. MetLife used in-house file reviewers, because it knew that the reviews would be unfavorable for the continuation of his benefits.

123. MetLife unreasonably failed to ensure that its in-house file reviewers provided unbiased opinions for purposes of its claims administration.

124. MetLife unreasonably failed to ensure that it maintained claim files that were critical to Mr. Winterberg's claim, and which supported Mr. Winterberg's claim. This includes the original LMS and a report prepared by MetLife's Medical Director Consultant, Dr. Joseph Monkofsky, which supports Mr. Winterberg's claim.

125. On information and belief, MetLife has retained its vendors on numerous occasions to conduct claims reviews or other evaluations and has a history of bias against claimants.

126. MetLife's review of the file was arbitrary, contrary to the record, and unsupported by the medical evidence.

127. Mr. Winterberg continues to meet the definition of disability under the Plan.

128. According to MetLife's calculation, the maximum duration of Mr. Winterberg's LTD benefits is until June 9, 2036, and he is entitled to benefits through that date.

129. Mr. Winterberg has exhausted his administrative remedies.

130. Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal and state common law, Mr. Winterberg is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

131. Mr. Winterberg is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his disability benefits. He is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

132. Pursuant to 29 U.S.C. § 1132(g), Mr. Winterberg is entitled to recover his attorneys' fees and costs incurred herein from MetLife and the Plan.

133. Mr. Winterberg is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid.

**WHEREFORE**, on all claims, Mr. Winterberg prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A. All past due LTD benefits under the terms of the Plan;

B. Clarifying and determining Mr. Winterberg's rights to future benefits under the terms of the Plan;

C. An award of Mr. Winterberg's attorneys' fees and costs incurred herein;

D. An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

E. For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 25th day of October, 2017.

OBER & PEKAS, PLLC

By: *s/ Erin Rose Ronstadt*
    Erin Rose Ronstadt
    Kevin Koelbel
    *Attorneys for Plaintiff*